IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| FORT HALL LANDOWNERS ALLIANCE, INC., ELI MOSHO, FRANK PAPSE, SR., ERNESTINE WERELUS, ALENE AUCK MENTA, WILVERNA COVINGTON, ALETHEA WETCHIE, LEE STONE, TWILA PAHVITSE BEAR, LEE BEAR, NINO BEAR, and INEZ PREACHER, on behalf of themselves and all others similarly situated, ) ) ) ) ) ) ) ) ) ) ) ) | Case No. CV-99-052-E-BLW **MEMORANDUM DECISION AND ORDER** |
| Plaintiffs, ) ) | |
| v. ) ) | |
| BUREAU OF INDIAN AFFAIRS, UNITED STATES DEPARTMENT OF THE INTERIOR, and GALE NORTON, Secretary, U.S. Department of the Interior, ) ) ) ) ) | |
| Defendants. ) _____) | |

## INTRODUCTION

The Court has before it a motion for summary judgment filed by the Government and a motion for partial summary judgment filed by plaintiffs. The Court heard oral argument on November 28, 2005, and the motions are now at issue. For the reasons expressed below, the Court will grant a partial summary

judgment to both parties on liability issues, leaving some liability issues, and the issue of damages, for trial.

## FACTUAL BACKGROUND

The plaintiffs are members of the Shoshone-Bannock Tribes and reside on the Fort Hall Reservation.  They own undivided interests in allotment lands on the Reservation.

The plaintiffs brought this suit to compel the Government to turn over information to them.  They claimed entitlement to the information under the Freedom of Information Act (FOIA), and claimed that by withholding the information, the Government was breaching its trust relationship with the Tribe.

The entire focus of the case shifted, however, when these claims were dismissed and others were added – instead of seeking information, the plaintiffs were now arguing that the Government released their personal information to others in violation of the Privacy Act and in breach of the trust relationship.

These disclosures, plaintiffs allege, occurred in connection with the renewals of leases of allotment land.  There are several hundred allotments at Fort Hall.  The allotments have been fractionalized so that nearly all of the allotments have several owners who each own an undivided interest.  The defendant Bureau of Indian Affairs (BIA) is responsible for negotiating agricultural leases and rights-of-way

**Memorandum Decision and Order – Page 2**

on behalf of the Indian landowners of the allotments.  Its office at Fort Hall is known as the Fort Hall Agency.

Each year, about 100 to 150 leases on Reservation land come up for renewal. Prior to the renewal date, the Fort Hall Agency would send a notice to all affected allotment owners advising them that "it will be the responsibility of the landowners to negotiate for the highest rental the market will offer."  *See Page 9 of Supplemental to Locke Affidavit (Docket No. 329).*

At the same time, plaintiffs assert, the Agency had a routine practice of notifying lessees of the names and addresses of allotment owners so that the lessees could initiate negotiations.  While the Government concedes that this was done in some cases, it denies that it did so on a routine basis.

At any rate, the parties had 90 days to negotiate a lease and obtain the approval of 51% of the landowners.  If that deadline was not met, the lessee would be relegated to a bidding process, supervised by the Agency, in which the lease renewal would go to the highest bidder.

In their amended complaint, plaintiffs claimed that the Agency's practice of disclosing their names and addresses to lessees and those seeking right-of-ways was a violation of the Privacy Act, and that it constituted a breach of the Government's trust relationship with the tribe.  Plaintiffs moved for class

**Memorandum Decision and Order – Page 3**

certification.

In response to a request from the Court to clarify their claims, counsel for plaintiffs stated that "it is not necessary to pursue the [breach of] trust claims on behalf of the entire class," and that "plaintiffs will withdraw its earlier response regarding class certification for the [breach of] trust claims and hereby notify the Court and counsel that plaintiffs' request for class certification is asserted for the Privacy Act claims only." *See Exhibit 1 to Government Brief in Opposition to Plaintiffs' Motion for Partial Summary Judgment.*

After considering the plaintiffs' withdrawal of their breach of trust claims, the Court certified a class of "all owners of trust land on the Reservation who had their names, addresses, and ownership information disclosed by the defendants in violation of federal regulations and the Privacy Act." *See Memorandum Decision & Order filed August 20, 2002 (Docket No. 204).* The plaintiffs have since narrowed their claims to the period from 1993 through 1999, and seek recovery only for disclosures connected with lease renewals that resulted from negotiation as opposed to the bidding process.

The Court issued a Scheduling Order setting the deadline for discovery on June 3, 2005. *See Scheduling Order filed November 10, 2003 (Docket No. 229).* After the parties completed discovery they filed their cross-motions.

**Memorandum Decision and Order – Page 4**

The Government seeks to dismiss the Privacy Act claim, the only claim remaining as to the class.  The plaintiffs filed their own motion for partial summary judgment, seeking a ruling on liability only, leaving damages for trial.

## ANALYSIS

## 1.    Elements of Privacy Act Claim

The parties agree that to establish liability under the Privacy Act, plaintiffs must establish the following elements: (1) that the disclosed information is a "record" contained within a "system of records;" (2) that the agency improperly disclosed the information; (3) that the disclosure was "willful or intentional"; and (4) that the disclosure had an adverse effect on plaintiffs.  *See Quinn v. Stone*, 978 F.2d 126, 131 (3d Cir. 1992).  The Government argues that plaintiffs cannot prove any of these elements, while plaintiffs respond that they have proven each one. The Court will examine them one-by-one.

## 2.    A "Record" Within a "System of Records"

The Government argues that plaintiffs cannot establish this element. Plaintiffs respond that the Government earlier admitted that this element has been established, and that it is estopped from withdrawing that admission.

Early in this lawsuit, the Government filed the Declaration of Marian Peterson, the FOIA Coordinator for the Portland Area Office of the BIA.  Peterson

was responding to the plaintiffs' initial FOIA claims seeking the identity of landowners of allotments over which Idaho Power had a right-of-way.  The right-of-way was coming up for renewal and plaintiff Fort Hall Landowners Alliance (FHLA) wanted to organize landowners and negotiate the renewal.  The Fort Hall Agency had provided this information to Idaho Power, but refused to provide it to the FHLA.

The FHLA argued that it should be entitled to the same information as Idaho Power.  To counter this claim, the Government submitted the Declaration of Peterson who testified that the Fort Hall Agency had given the information to Idaho Power "in error."  *See Peterson Declaration* at ¶ 6, p. 2.  She testified that the information was protected by the Privacy Act because "the list of names and addresses was generated from documents contained in a Privacy Act system of records, which the BIA has titled 'Indian Land Leases-Interior/BIA-5' and for which the U.S. Department of the Interior published a system notice in the Federal Register on September 13, 1983 . . . ."  *Id.*

In other words, Peterson testified that the names and addresses of allotment landowners were generated from a "record" contained in a "system of records" as those terms are defined in the Privacy Act.  The Court relied upon this statement in finding that both sides agreed that the records were covered by the Privacy Act.

**Memorandum Decision and Order – Page 6**

*See Memorandum Decision and Order filed March 17, 2000* at pp. 6-7.

Peterson is talking about the same type of information allegedly disclosed in this case. To avoid the FOIA charge, the Government argued that the information was covered by the Privacy Act. When that assertion became damaging once the Privacy Act claim was pursued, the Government switched direction and claimed that its earlier assertion was not true.

The doctrine of judicial estoppel prevents the Government from having it both ways: "Judicial estoppel . . . precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600 (9th Cir. 1996).

The Government submits the Declaration of Marge Edmo to describe the Fort Hall Agency process between 1993 and 1999, in contradiction to the description contained in Peterson's Declaration. The plaintiffs have moved to strike Edmo's Declaration, and the Court will grant that motion. The Government may not create its own issues of fact by submitting a declaration that contradicts its own previous declaration. *See Radobenko v. Automated Equipment Corp.,* 520 F.2d 540, 544 (9th Cir. 1975).

The Government accurately points out that when it elected not to contest the

plaintiffs' claim that the disclosure to Idaho Power violated the Privacy Act, the

Government "reserved the right to assert any defenses . . . should plaintiffs assert

additional claims on behalf of other unnamed individuals . . . ." *See Memorandum*

*Decision & Order filed March 28, 2001 (Docket No. 166).* The Government

asserts that it is merely exercising its reserved right to assert the defense against

entities other than Idaho Power.

The Court disagrees. By the time the Government decided to reserve its

rights, it had long-ago waived its "records" defense.[1] Thus, whatever rights it

reserved, those rights no longer included the right to assert a "records" defense.

Certainly the Government had the right to waive defenses as against Idaho

Power, and reserve the right to assert those defenses against others, as it did in its

filing of May 22, 2000. *See Government Reply Brief (Docket No. 145)* at pp. 4-5.

If the Government, as part of that waiver and reservation of rights, had waived the

"records" defense as against Idaho Power but reserved the right to assert it against

others, the Court would allow the Government to now raise the defense.

However, that is not what occurred. The Government had waived the

"records" defense much earlier – when it filed the Peterson Declaration back in

---

[1] The Government filed the Petersen Declaration – waiving the "records" defense – in 1999, but did not make its reservation of rights decision until May 22, 2000. *See Government Reply Brief (Docket No. 145)* at pp. 4-5. By May 22, 2000, whatever rights the Government reserved, those rights no longer included the right to assert the "records" defense.

1999 – in attempting to prevail on plaintiffs' original FOIA claim.  Thus, the Government's waiver of the "records" defense had already occurred and was not connected in any way to its later waiver of defenses against Idaho Power and reservation of rights.

The Court finds the doctrine of judicial estoppel applies here.  The Government is taking inconsistent positions, the Court relied on the Government's original position, and plaintiffs will be prejudiced if the Government is not estopped.  *See Hamilton v. State Farm*, 270 F.3d 778, 782-83 (9th Cir. 2001).  The Court therefore finds as a matter of law that disclosures of names, addresses, and ownership information concerning allotment landowners is the disclosure of a record from a system of records under the Privacy Act.

## 3.    <u>Improper Disclosures</u>

The second element is that the agency made improper disclosures.  The Government admits making some improper disclosures, but counts far fewer than the plaintiffs. The disparate counting raises questions of fact concerning precisely how many disclosures were made, and who was affected.  The Court cannot find that this element has been satisfied in the abstract.  Thus, the Court refuses to grant summary judgment on this element to either party.

## 4.    <u>Willful and Intentional</u>

**Memorandum Decision and Order – Page 9**

This element is also heavily factual.  The bare record is a poor basis for resolving matters of intent.  The Court will likewise refuse to grant summary judgment for either party on this element.

**5.    <u>Adverse Effect</u>**

The fourth element requires the plaintiffs to show (1) an adverse effect, and (2) a causal connection between the agency violation and the adverse effect.  *Doe v. Chao*, 540 U.S. 614, 624-25 (2004).  These two requirements "act[] as . . . term[s] of art identifying a potential plaintiff who satisfies the injury-in-fact and causation requirements of Article III standing, and who may consequently bring a civil action without suffering dismissal for want of standing to sue."  *Id*.

It is important not to confuse this standing requirement with the entirely separate element that requires proof of actual damages.  *Chao* explained that a plaintiff who satisfied the adverse effect requirements merely "open[ed] the courthouse door" for standing purposes, but was not entitled to recovery until he proved actual damages.  *Id*; *see also*, *Quinn v. Stone*, 978 F.2d 126, 135 n. 15 (3d Cir. 1993)(stating that "[t]he adverse effect that a plaintiff must show within the meaning of [the Privacy Act] is not necessarily equivalent to 'actual damages'").

Thus, to satisfy the Privacy Act's adverse effect and causation requirements, plaintiffs need not show actual damages from the disclosure, but must merely

**Memorandum Decision and Order – Page 10**

satisfy the traditional "injury-in-fact and causation requirements of Article III."  *Id.*

For Article III standing purposes, "[t]he injury itself need be nothing more than a

trifle."  *National Wildlife Federation v. Burford*, 871 F.2d 849, 854 (9th Cir. 1989);

*United States v. SCRAP*, 412 U.S. 669, 689 n. 14 (1973) (holding that "an

identifiable trifle is enough for standing to fight out a question of principle; the

trifle is the basis for standing and the principle supplies the motivation").

 In this case, plaintiffs have identified three different injuries-in-fact: (1) the

invasion of privacy that accompanies each disclosure; (2) the breach of the

Government's trust relationship with the Tribe that occurred with each disclosure;

and (3) the lower rents that resulted because the disclosures allowed lessees to

bypass the bidding process that would have resulted in higher rents.

 The invasion of privacy is the injury that best fits the low threshold required

for standing purposes.  Each class member alleges that he or she is a victim of a

disclosure in violation of the Privacy Act, and each disclosure would violate the

class member's privacy.  The causation requirement would be likewise satisfied

because there is no evidence that lessees were receiving the information from any

other source.

 Having made this determination, the Court need not resolve whether the

breach of the trust relationship or the lower rents also provide the necessary injury-

**Memorandum Decision and Order – Page 11**

in-fact.  The Court also need not identify at this time those class members who are victims of disclosures in violation of the Privacy Act.  On this issue, standing is completely intertwined with the merits of the case.  If, at trial, any class member cannot prove that he or she was a victim of an improper disclosure, that class member has no standing and no claim on the merits under the Privacy Act.  That determination must await trial.

**6.   Method of Proving Adverse Effect**

The plaintiffs argue, however, that they need not show a separate violation for every class member.  Instead, they seek to use Rule of Evidence 406 to establish that Fort Hall had a routine practice, from 1993 through 1999, of making disclosures in violation of the Privacy Act, which creates an inference that all lease renewals during that period were tainted by improper disclosures.[2]

Rule 406 admits evidence of "the routine practice of an organization . . . to prove that the conduct of the . . . organization on a particular occasion was in

---

[2]  The plaintiffs actually use Rule 406 for two purposes:  (1) To proffer evidence of frequent disclosures from 1993 through 1999 to raise an inference that disclosures were made for every lease renewal during that period; (2) To proffer testimony of clerks that they placed certain items in a lease renewal file – such as "Dear Applicant" letters or a certified mail receipt – when they had disclosed landowner names and addresses to lessees, to raise an inference that the presence of such items in a lease renewal file means that a disclosure in violation of the Privacy Act had taken place.  The latter use of Rule 406 poses no problem – that is the standard manner in which the Rule is invoked.  It is the former use to which the Government raises a substantial objection and which is discussed herein.

**Memorandum Decision and Order – Page 12**

conformity with the . . . routine practice."  Plaintiffs bear the burden of showing that certain conduct occurred often enough to qualify as a routine practice under Rule 406.  *See Weil v. Seltzer*, 873 F.2d 1453 (D.C. Cir. 1989).  A routine practice is "never to be lightly established" and the evidence proffered to establish it must be "carefully scrutinized."  *Mathes v. The Clipper Fleet*, 774 F.2d 980, 984 (9th Cir. 1985).  "It is only when the examples offered to establish such pattern of conduct or habit are numerous enough to base an inference of systematic conduct . . . that they are admissible to establish pattern or habit."  *Id.* (internal citations omitted).  The plaintiffs must "establish the degree of specificity and frequency of uniform response that ensures more than a mere 'tendency' to act in a given manner, but rather, conduct that is 'semi-automatic' in nature."  *Simplex, Inc. v. Diversified Energy Systems, Inc.,* 847 F.2d 1290, 1293 (7th Cir. 1988).

With these standards in mind, the Court turns to examine the evidence of routine practice proffered by plaintiffs.  Their evidence is of two types.  First they submit a written Fort Hall Agency policy document along with recollections of Agency employees about the policy of the office.  Second, they submit data on the number of disclosures.

The policy document is entitled "Fort Hall Agency Leasing Process," and it sets forth a basic outline of the leasing process.  *See Exhibit 22 to Locke Affidavit*.

**Memorandum Decision and Order – Page 13**

Under the heading "Negotiation," it directs the "[p]otential lessee to contact all landowners to negotiate lease terms."  This clearly implies that the Fort Hall Agency will be providing protected information to lessees – how else could lessees contact landowners?

The document is not dated, however.  The deposition excerpts provided by plaintiffs do little to clarify the document's effective date.  While one employee of Fort Hall testified that the document was in effect "after March of 1996" and was "still ongoing in '99," that leaves out more than three years (1993 to March of 1996) during the seven-year period within which plaintiffs seek to establish a routine practice.  *See Hernandez Deposition* at p. 85.

Moreover, there is contrary evidence contained within other excerpts provided by plaintiffs.  BIA employee Norman Bird testified that lessees were provided with landowner names and addresses only "around '96, '97 for, I want to say, maybe a year or two" and then "we went back to the bureau, basically, sending out the consents without the applicant or tenant knowing the landowner."  *See Bird Deposition* at p. 63.  This testimony certainly does not establish a routine practice lasting over seven years.

Yet another employee, Liz Siow of the Fort Hall Realty Office, testified that prior to 1997, disclosures were made only to "anxious" lessees.  *See Siow*

**Memorandum Decision and Order – Page 14**

*Deposition* at p. 90.  She was never asked to reveal what percentage of total lessees were "anxious," and so it is impossible to tell if disclosure was routine.

Plaintiffs also quote from the Declaration of Ronald Appelbaum, a Realty Specialist with the BIA.  He testified that "Fort Hall Agency advised me that it does regularly give ownership information to individuals seeking leases and to utilities who desire to acquire a right-of-way."  *See Appelbaum Declaration* at ¶ 4, p. 2.  While Appelbaum states that he was told this in 1999, he gives no further information about the time period this regular practice was in effect.  The Court has no way of knowing if the "regular" practice was ongoing for years, months, or days.

Examining all of this evidence together, two reasonable inferences emerge: (1) that the Fort Hall Agency routinely sent disclosures *at some time* between 1993 and 1999; and (2) that the Fort Hall Agency did not routinely send disclosures *for the entire period* from 1993 through 1999.

The first inference gets the plaintiffs nowhere – it is far too vague to begin applying it to precise years between 1993 and 1999.  The plaintiffs need to establish a routine practice for the entire period, and this evidence simply does not support such an inference under Rule 406.

There remains, however, another piece of evidence to analyze – the data on

disclosures.  The plaintiffs count 74,427 disclosures in violation of the Privacy Act

during the 1993-1999 period.  *See Exhibit 15 to Locke Affidavit*.[3]  Plaintiffs claim

that this massive number of disclosures shows a routine practice.  But a routine

practice of what?  Plaintiffs are trying to establish a routine practice of disclosures

*in lease renewals*.  They must show  that many leases renewals were accompanied

by disclosures.  That showing cannot necessarily be made simply by showing a

large number of total disclosures, as a simple example makes plain.

Assume one prospective lessee wanted to renew a lease on an allotment

with 100 landowners.  If Fort Hall disclosed protected information in connection

with the renewal, there would be 100 disclosures.  That is a large number.  But if

during that year, 99 other leases were renewed without disclosures, then Fort Hall

would only have committed improper disclosures in just 1% of the leases renewed

that year, a minuscule number and certainly no evidence of a "semi-automatic"

routine practice.

The proper focus, then, is on how often disclosures were made in lease

renewals from 1993 through 1999.[4]  According to plaintiffs' own figures,

---

[3] The Government counts far fewer.  *See Affidavit of Lynch.*  The Court need not resolve
here the total number of disclosures.

[4] The Government seeks to expand the comparison to include a twelve-year period
between 1993 and 2003.  However, that goes beyond the period the plaintiffs have put at issue,
and will therefore not be adopted by the Court.

**Memorandum Decision and Order – Page 16**

disclosures occurred in 197 lease renewals during that period.  *See Exhibit 15 to Affidavit of Locke*.  There were a total of about 700 lease renewals in that period.[5]

This means that in more than two-thirds of the leases renewed, no improper disclosures took place, even assuming the accuracy of all plaintiffs' assumptions.  These figures do not establish a routine practice.  In fact, they establish just the opposite – that there was no routine practice of disclosure.  When these figures are examined together with the recollection testimony and other evidence discussed earlier, the only reasonable inference that can be drawn is that there was no routine practice of disclosure in lease renewals between 1993 and 1999.

The Government seeks a summary judgment that no routine practice has been established under Rule 406.  The Court agrees and will grant the motion to that extent.

The plaintiffs will therefore need to prove each disclosure separately.  That should not be an impossible task, given that plaintiffs have narrowed their claims to negotiated leases, and there were about 150 such lease renewals during the seven-year period.  *See Siow Deposition* at p. 97 (testifying that about 20 leases per

_____

[5]  This assumes 100 lease renewals a year.  Liz Siow testified that between 100 and 150 leases are renewed each year.  *See Siow Deposition* at p. 85.  There were 1,863 leases renewed between 1993 and 2004, an average of 155 per year.  The Court assumes the low end – 100 lease renewals – because it is the most favorable figure for the plaintiffs.

**Memorandum Decision and Order – Page 17**

year were renewed through negotiation as opposed to bidding).[6]

## 7.   <u>Actual Damages</u>

Under *Chao*, plaintiffs must prove actual damages in order to be entitled to relief under the Privacy Act.  As discussed above, the element of actual damages requires more than the "trifle" sufficient for standing.  *Chao* did not define the showing necessary to establish actual damages, other than to observe a split in the circuits between those who defined it to include mental anxiety and those who limited it to pecuniary loss.  *Chao*, 540 U.S. at 627, n.12.

The parties did not brief the issue of actual damages.  Both motions were limited to liability issues.  The Court will therefore not issue any rulings on this issue, but will identify two concerns for the benefit of counsel.

First, the Court anticipates plaintiffs arguing that the breach of the trust relationship constitutes actual damages.  That would be an attempt to bring through the back door that which cannot enter through the front.  The plaintiffs withdrew that claim back in 2002, and justifiably, the Government did no discovery on it. The discovery deadline passed six months ago.

Importantly, this theory of actual damages would require the plaintiffs to

---

[6]  At oral argument on the motions at issue here, plaintiffs' counsel stated that plaintiffs were seeking recovery only for lease renewals resulting from negotiation and not from the bidding process.

show not only the breach of the trust relationship, but also the injury caused by the breach, such as emotional distress.  But this is precisely the same showing they would have made on the direct claim, that they withdrew.  In other words, allowing plaintiffs to argue that the breach (and its consequent injury) constitutes actual damages would be to allow plaintiffs to resurrect the very claim that they withdrew three years ago.  That would be patently unfair to the Government.  While the Court will hear argument, the Court puts plaintiffs on notice that it is very skeptical of this theory of actual damages.

Second, the alternative theory – that actual damages consist of the lower rents obtained due to the disclosures – is inapplicable to right-of-ways with Northwest Pipe and Idaho Power.  Those entities were the only entities licensed to, respectively, lay pipe and run wire.  Thus, there was no more competitive alternative to negotiation.  The Court is skeptical that plaintiffs can show actual damages in connection with disclosures to these two entities.

## 8.    Statute of Limitations

The issues of what the plaintiffs knew and when they knew it are factual in nature.  *See Bibeau v. Pacific Northwest Research Foundation, Inc.,* 188 F.3d 1105 (9th Cir. 1999).  The Court finds these issues cannot be resolved on summary judgment, and hence will deny the Government's motion on this ground.

**Memorandum Decision and Order – Page 19**

# ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the Government's motion for summary judgment and alternatively for partial dismissal (Docket No. 302) is GRANTED IN PART AND DENIED IN PART.  It is granted to the extent it seeks a ruling that plaintiffs have not shown evidence of a routine practice of disclosures in lease renewals for the period from 1993 through 1999.  It is denied in all other respects.

IT IS FURTHER ORDERED, that the plaintiffs' motion for partial summary judgment (Docket No. 306) is GRANTED IN PART AND DENIED IN PART.  It is granted to the extent it seeks a finding that disclosures of names, addresses, and ownership information of allotment landowners by the Fort Hall Agency to prospective lessees and owners of right-of-ways is the disclosure of a "record" within a "system of records" under the Privacy Act.  It is denied in all other respects.

IT IS FURTHER ORDERED, that plaintiffs' motion to strike Edmo

Declaration (Docket No. 330) is GRANTED.

DATED:  **January 5, 2006**

B. LYNN WINMILL
Chief Judge
United States District Court